1

```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA      .    Criminal No. 1:12cr386
                                   .
 4        vs.                      .    Alexandria, Virginia
                                   .    May 8, 2012
 5   KIANA CHERRIE McKELVIN,       .    10:00 a.m.
                                   .
 6                Defendant.       .
                                   .
 7   .  .  .  .  .  .  .  .  .  .  .

 8                    TRANSCRIPT OF PLEA HEARING
                BEFORE THE HONORABLE LEONIE M. BRINKEMA
 9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   FOR THE GOVERNMENT:          KIMBERLY R. PEDERSEN, AUSA
                                  PATRICIA M. HAYNES, AUSA
12                                United States Attorney's Office
                                  2100 Jamieson Avenue
13                                Alexandria, VA 22314

14
     FOR THE DEFENDANT:           JOHN A. BONETA, ESQ.
15                                John A. Boneta & Associates
                                  258 North Washington Street
16                                Falls Church, VA 22046

17
     OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
18                                U.S. District Court, Fifth Floor
                                  401 Courthouse Square
19                                Alexandria, VA 22314
                                  (703)299-8595
20

21

22
                         (Pages 1 - 40)
23

24

25
               COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

2

P R O C E E D I N G S

1

2      THE CLERK:  Criminal Case 12-38-006, United States of

3  America v. Kiana Cherrie McKelvin.  Will counsel please note

4  their appearances for the record.

5      MS. PEDERSEN:  Good morning, Your Honor.  Kim

6  Pedersen and --

7      THE COURT:  Isn't this set for 10:00?

8      MS. PEDERSEN:  It was, Your Honor, yes.

9      THE COURT:  Do we have defense counsel here?

10     MS. PEDERSEN:  They're in the building.  I saw them

11 this morning.  They're probably out in the hallway, Your Honor.

12     THE COURT:  Let's see if they're there before we have

13 an issue.

14                (Defendant present.)

15     MR. BONETA:  Good morning, Judge Brinkema.  John

16 Boneta on behalf of Ms. McKelvin.

17     THE COURT:  All right.  Are all the papers signed?

18     MS. PEDERSEN:  They are, Your Honor.  Good morning.

19 Kim Pedersen and Trish Haynes for the United States.  The

20 defense counsel has the originals, Your Honor.

21     THE COURT:  All right, we need to get them.

22     MS. PEDERSEN:  There's a copy at the podium for the

23 parties.

24     THE COURT:  All right.  And I assume there's a

25 motion -- oh, actually, we don't have to dismiss any counts in

3

1    this case.

2            MS. PEDERSEN:  That's correct, Your Honor.  She was

3    charged simply in one count, Count 2.

4            THE COURT:  All right.  Ms. McKelvin, come up to the

5    lectern.  The clerk is going to place you under an affirmation.

6            KIANA CHERRIE McKELVIN, DEFENDANT, AFFIRMED

7            THE COURT:  All right.  Ms. McKelvin, you have now

8    taken a promise to tell the truth in answering all of the

9    Court's questions.

10            THE DEFENDANT:  Yes.

11            THE COURT:  That means that if you should lie in

12    answering any question, the government could prosecute you for

13    a new and separate crime called perjury.  Do you understand

14    that?

15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  For the record, what is your full name?

17            THE DEFENDANT:  Kiana Cherrie McKelvin.

18            THE COURT:  And, Ms. McKelvin, how old are you?

19            THE DEFENDANT:  Thirty-one years old.

20            THE COURT:  How much education have you completed?

21            THE DEFENDANT:  I'm currently enrolled in college

22    right now at the Art Institute of Washington, Your Honor.

23            THE COURT:  All right.  Do you have any problem

24    reading, writing, understanding, or speaking English?

25            THE DEFENDANT:  No, Your Honor.

4

1          THE COURT:  And you are a United States citizen,

2    correct?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Are you presently on probation or parole

5    or supervised release from any other criminal case?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  Are you at this time under the care of a

8    doctor for any physical or mental condition?

9          THE DEFENDANT:  No, Your Honor.

10         THE COURT:  Within the last 24 hours, have you taken

11   any medication, whether over the counter or by prescription?

12         THE DEFENDANT:  Allergy medication, Zyrtec.

13         THE COURT:  All right.  When did you take that?

14         THE DEFENDANT:  Probably 24 hours ago.

15         THE COURT:  Does that medication make you at all

16   sleepy or drowsy?

17         THE DEFENDANT:  No, Your Honor.

18         THE COURT:  No side effects that you can feel?

19         THE DEFENDANT:  No, Your Honor.

20         THE COURT:  All right.  Other than that medication,

21   have you had anything else in your system in the last 24 hours

22   of a medical nature?

23         THE DEFENDANT:  No, Your Honor.

24         THE COURT:  Are you at this time under the influence

25   of alcohol or any drugs?

5

1              THE DEFENDANT:  No, Your Honor.

2              THE COURT:  All right, Ms. McKelvin, we have in court

3    today a written plea agreement.  It's 14 pages long, and I see

4    on the last page what appears to be your signature with today's

5    date.

6              THE DEFENDANT:  Yes.

7              THE COURT:  Did you, in fact, sign the written plea

8    agreement?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Now, when did you first see a copy of the

11   plea agreement, approximately?

12             THE DEFENDANT:  Last Wednesday, Your Honor, I

13   believe.

14             THE COURT:  All right.  And how did you, how did you

15   see it?  Were you at your attorney's office or --

16             THE DEFENDANT:  I received it via e-mail.

17             THE COURT:  All right.  So you first got a copy of

18   the plea agreement and you were by yourself at that point?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  All right.  Did you eventually meet with

21   your counsel to discuss the plea agreement?

22             THE DEFENDANT:  An hour ago, Your Honor.

23             THE COURT:  All right.  After you received it by

24   e-mail, did you have any communication with Mr. Boneta about

25   the plea agreement?

6

```
 1              THE DEFENDANT:  No, Your Honor.

 2              THE COURT:  All right.  Had you been discussing the

 3   plea agreement with him before you received the e-mail?

 4              THE DEFENDANT:  Yes, Your Honor.

 5              THE COURT:  All right.  And had you discussed the

 6   plea agreement in detail with counsel?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  All right.  Now -- so you got the plea

 9   agreement a few days ago by e-mail, correct?

10              THE DEFENDANT:  Yes, correct.

11              THE COURT:  And did you read it over for yourself

12   word for word?

13              THE DEFENDANT:  Yes, Your Honor.

14              THE COURT:  All right.  And then as I understand it,

15   you then met Mr. Boneta just about an hour ago to go over the

16   plea agreement with him?

17              THE DEFENDANT:  In detail, yes.

18              THE COURT:  Did you ask him in that hour all the

19   questions that you have about the plea agreement?

20              THE DEFENDANT:  Yes, Your Honor.

21              THE COURT:  Has he answered all of your questions to

22   your satisfaction?

23              THE DEFENDANT:  Yes, Your Honor.

24              THE COURT:  As you stand in court this morning, are

25   there any questions you want to ask me about the plea
```

7

1  agreement?

2          THE DEFENDANT:  No, Your Honor.

3          THE COURT:  And are you satisfied that one hour of

4  discussion with your attorney over the plea agreement was

5  enough time?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Was the plea agreement that you received

8  consistent with the discussions you'd had with counsel before

9  you got the agreement?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  All right.  And does that include the

12 statement of facts?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  All right.  I want you to turn to page 14

15 of the plea agreement.  I assume you have it there in front of

16 you?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  All right.  I want you to look at the two

19 sentences right above where your signature would be.  Do you

20 see them?  And I'll read them just to make sure we're all

21 looking at the same thing.  They go, "I have read this plea

22 agreement and carefully reviewed every part of it with my

23 attorney.  I understand this agreement and voluntarily agree to

24 it."

25         Do you see those two sentences?

8

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Now, are they completely true in every

3  respect?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you understand, Ms. McKelvin, that by

6  telling the Court that you've read the entire plea agreement

7  and discussed it thoroughly with your counsel and that you

8  understand the agreement and you're voluntarily agreeing to it,

9  that means you'll be bound by everything written in this

10  14-page document even if I don't go over every paragraph or

11  page of the agreement with you today?  Do you understand that?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And the reason for that result is that

14  this written plea agreement is really a written contract

15  between you and the United States government, and when a person

16  signs a written contract after she's read it over herself and

17  discussed it thoroughly with counsel and she understands it and

18  signs it voluntarily, then that's a binding legal instrument,

19  and you can't just come back to court in a couple of weeks and

20  say, "You know, I've changed my mind.  I don't like what's on

21  page 6."

22          It's too late.  Do you understand that?

23          THE DEFENDANT:  I understand, Your Honor.

24          THE COURT:  Now, other than the written plea

25  agreement that's in court this morning, do you have any side

1  deals or side understandings with any investigator, whether

2  federal or state, or federal or state prosecutor concerning

3  this case?

4           THE DEFENDANT:  No, Your Honor.

5           THE COURT:  Counsel, is that correct?

6           MR. BONETA:  That's correct, Judge.

7           THE COURT:  All right, let's turn then to page 1,

8  paragraph 1, and there it says you've agreed to plead guilty to

9  Count 2 of the indictment, and that count charges you with

10  being a member of a conspiracy to travel and use interstate

11  facilities in aid of a racketeering enterprise, in violation of

12  Title 18, United States Code, Sections 1952(a)(1), 1952(a)(3),

13  and Section 371.

14           Now, I just want to make sure, the actual citation or

15  the actual offense for Count 2, 371 is the general federal

16  conspiracy statute, and it normally carries a five-year maximum

17  penalty, but you've indicated there's three years.  Where is

18  the three coming from?  From the --

19           MS. PEDERSEN:  It's coming from the 1952 sections,

20  Your Honor.

21           THE COURT:  All right.  And you're satisfied that

22  those trump 371?

23           MS. PEDERSEN:  371 may be higher.  She may be subject

24  to the five years.

25           THE COURT:  Well, that's what I'm trying to

1   determine.  Counsel, did you look at this issue carefully?  I

2   mean, normally, 371 is a five-year exposure.

3            MR. BONETA:  Your Honor, when I looked at the

4   statute, Judge, I assumed it was up to five years, and then we

5   met with the prosecutor at their office when we did a reverse

6   proffer, and in their plea agreement, they had it up to three

7   years.  It was my understanding that's how they were looking.

8            Obviously, I went with an interpretation that I

9   thought was better for my client with less exposure, but my

10  initial calculation was five years on the conspiracy.

11           MS. PEDERSEN:  Your Honor, if I may, I'm just

12  reviewing the statute again.  It's clear that it is five for

13  the 371.  At this time, I'd like to amend the plea agreement.

14  We're stating this orally on the record.  The defendant is on

15  notice of this.  If you'd like to make a change, that's fine.

16  I think we should make a written change by handwriting and

17  noting it on the plea itself.

18           THE COURT:  I think you have to.  And again --

19           MS. PEDERSEN:  I think the guidelines are going to be

20  what are going to drive this.  It's substantially lower than

21  either the five or the three in actuality, but I think for

22  safety sake, the maximum that she would be exposed to would be

23  the five under the 371.

24           THE COURT:  And the -- now, I didn't have time to

25  look at this.  1952, the two subsections that the defendant is

11

1    charged with, those have a three-year max?

2              MS. PEDERSEN:  That's correct.

3              THE COURT:  That's a strange anomaly, that the

4    conspiracy -- normally it works the other way -- but that the

5    conspiracy exposure would be higher than the substantive

6    offense, so I would think from an analytical standpoint, the

7    three years is probably the correct one, but out of an

8    abundance of caution, to alert the defendant that it's possible

9    you're looking at five years is a safer approach.

10             And, counsel, if you and your client want to discuss

11   that, you ought to spend a few minutes, but I'm going to give

12   you back the original plea agreement, which would need to be

13   signed.

14             (Discussion between Mr. Boneta and defendant off the

15   record.)

16             MR. BONETA:  Your Honor, for the record, I explained

17   to my client initially that I believed it was five years.  When

18   we saw what was in the plea agreement, I told her that was the

19   prosecutor's interpretation.  We, we understand that it is five

20   years now.  My understanding is it does not affect the

21   sentencing guidelines, but my client is aware that the maximum

22   exposure is five years.

23             THE COURT:  All right.  Ms. McKelvin, do you -- are

24   you comfortable with going forward with the plea today?

25             THE DEFENDANT:  Yes, Your Honor.

12

1        THE COURT:  And do you feel you've had enough time to

2   discuss with counsel this change to the possible exposure that

3   you have in this case?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  All right, that's fine.  Let me go back

6   over that then.  So you're looking at the possibility of up to

7   five years of imprisonment.  And you should understand this

8   conspiracy is a felony; do you understand that?  So you're

9   going to have to report a felony conviction on your record, you

10  know, down the road, and there are ramifications of that.

11       THE DEFENDANT:  Yes, Your Honor.

12       THE COURT:  All right.  So five years' imprisonment

13  followed by up to three -- and again, at least three years?  I

14  think it's up to three years.

15       MS. PEDERSEN:  I think it's at least three years.

16  That's the bottom of the guidelines for the supervised release

17  term, Your Honor.

18       THE COURT:  I don't think a five-year felony can

19  expose a person to more than three years of supervised release.

20       MS. PEDERSEN:  I'll double-check, Your Honor.

21       THE COURT:  Okay.

22       All right, the fine would be up to $250,000.  There's

23  I don't believe any restitution being required or called for in

24  this case, so there's no restitution you have to worry about.

25  The special assessment would be $100.

13

1          I believe the maximum exposure in terms of supervised

2    release is three years in this case, but I want to make sure,

3    Ms. Pedersen, while we're doing this, if you'd confirm that?

4          MS. PEDERSEN:  Yes, Your Honor.

5          THE COURT:  In any case, the supervised release

6    portion of the sentence does not begin until the prison portion

7    has been satisfied.  Do you understand that?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And there is no possibility for parole in

10   the federal system, so if any term of imprisonment is imposed,

11   you will have to serve the entire period.  Do you understand

12   that?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  And then when the supervised release part

15   of the sentence begins, that will involve your being placed

16   under the control of the probation officer, very much like the

17   pretrial officer you're working with now, and there'll be terms

18   and conditions to the supervision.  I can't tell you what those

19   terms and conditions would be yet.  Normally there are

20   requirements that you do certain things and also perhaps

21   requirements that you not do certain things.

22         The key thing you need to understand, however, is

23   that if you violate any condition of supervised release, you

24   could be punished by being sent back to prison, and that could

25   be for as long as the period of supervised release.  In this

14

1   case, I'm quite sure it's not going to be more than three

2   years, but in any case, you need to understand that that's part

3   of your sentence.

4           Do you understand that?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  All right.  Now, when it comes time for

7   sentencing, the Court is going to need to look at two sources

8   of law that relate to sentencing.  The first would be the

9   federal sentencing guidelines, and then the Court must also

10  look at the factors under Section 3553(a) of Title 18.

11          Now, under the guidelines, the Court has to make two

12  decisions.  We have to determine your criminal history, and we

13  have to determine the offense level.  Have you discussed

14  guidelines sentencing with counsel?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  All right.  I'm assuming he's gone over

17  much of this with you, but I want to make sure that you

18  understand it clearly.  In terms of criminal history, those are

19  divided into six categories, and each category gets a number.

20  A No. I criminal history would go to somebody who's never been

21  in trouble with the law or who has a very minor record, and

22  then as convictions and other problems occur on the record, the

23  score goes up, with a level VI going to the most serious

24  offenders.

25          Do you understand that?

15

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Then the Court must determine the offense

3    level.  Now, every federal crime has a number given to it by

4    the Sentencing Commission, and then depending upon the specific

5    facts of the case, the score can go up or down.

6              And in paragraph 4 of your plea agreement, there's an

7    indication that you and your counsel and the government have

8    agreed to a significant number of factors that do affect the

9    calculation of the offense level.  For example, you've agreed

10   as to what the base offense level guideline ought to be, which

11   would be a level 14.  You've agreed that if the offense

12   involved more than one victim, then certain applications will

13   apply if the promoting of a commercial sex act in respect to

14   each victim had been contained in a separate count of

15   conviction.

16             So in other words, the more victims involved in an

17   offense, usually the higher the score is going to be.  Do you

18   understand that?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  All right.  And then you've agreed to the

21   guideline that's going to affect the procedure for determining

22   the offense level on multiple counts.

23             Now, in addition to all of that, the government has

24   agreed that if you qualify for the two-level reduction to the

25   offense level for full acceptance of responsibility and if the

1   overall offense level is a 16 or above, then the government

2   will move for a third point reduction to the offense level.  I

3   believe that that is pretty much what you-all have covered in

4   terms of the guidelines.

5            At the end of the day, it will be the Court that's

6   going to decide both the criminal history and the offense

7   level, but when those two numbers are determined, then they're

8   put on a one-page chart called the Sentencing Guideline Table,

9   and that will establish an advisory guideline range.  Now, the

10  Court has to look at that range in terms of determining the

11  proper sentence but is not bound by that range and, in fact,

12  can sentence above it or below it.

13           Do you understand that?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  In addition to the guideline range, the

16  Court, of course, is going to consider, as I said earlier, all

17  the factors in 3553(a), so we will look in detail at your

18  employment history, your education and family background, your

19  specific role in the offense, and other factors in determining

20  the proper sentence.

21           Do you understand that?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  Ms. Pedersen, have you been able to

24  determine what is the proper period of supervised release?

25           MS. PEDERSEN:  Yes, Your Honor.  Under 18 U.S.C.

17

1    3583(b)(2), for a class D felony, and this is a class D felony,

2    it says not more than three years.

3          THE COURT:  Not more than, all right.  So "at least"

4    is not correct.

5          MS. PEDERSEN:  I would say "not more than," because

6    that's what the statute provides.

7          THE COURT:  Right.  I'm just going to initial that,

8    because that's what we're doing in open court, all right?  It's

9    to the defendant's benefit.  But if you have any more pleas to

10   Count 2, you should make sure that language is changed.

11         MS. PEDERSEN:  Yes, Your Honor.

12         THE COURT:  All right.  Now, Ms. McKelvin, I'm going

13   to assume that you and your lawyer have discussed a great deal

14   the potential sentence you might receive in this case.  Have

15   you done that?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  All right.  And he most likely has given

18   you some estimates as to what he thinks your guideline numbers

19   will come out to be and also what sentence he thinks you may

20   ultimately get.  Has he done that?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  I want to make sure you understand that

23   no matter what your lawyer may have told you he thinks the

24   guideline numbers will be or what sentence he thinks you will

25   get, or for that matter, if the prosecutors or investigators or

18

1    anybody else have given you their ideas about what sentence you

2    will ultimately get in this case, none of those discussions in

3    any respect bind or limit the probation officer who prepares

4    the pre-sentence report or this Court when it goes to sentence

5    you.

6          Do you understand that?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  And so if at the sentencing hearing you

9    receive a sentence that is different from what you are

10   expecting or hoping for, that will not give you a basis to

11   withdraw your guilty plea, because that would not constitute a

12   violation of the plea agreement.  Do you understand that?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Now, normally a defendant in a criminal

15   case has the right to appeal both her conviction and her

16   sentence, but if you look at paragraph 5 of your plea agreement

17   on page 4, in particular the sentence that beginnings with the

18   word "nonetheless," as part of this plea agreement, you are

19   knowingly waiving -- and the word "waive" in the law means to

20   give up -- so you are knowingly giving up both your right to

21   appeal the conviction as well as to appeal any sentence as long

22   as the sentence does not exceed the statutory maximum.

23         That means as long as the sentence is not more than

24   five years of imprisonment followed by not more than three

25   years of supervised release and the fine does not exceed

19

1    $250,000 and the special assessment is not greater than $100,

2    you cannot appeal that sentence for any reason.

3           Do you understand that?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Now, in exchange for your guilty plea,

6    the government has agreed in paragraph 8 that it will not

7    further prosecute you in this district for any of the

8    activities described either in the statement of facts or in the

9    indictment.  Now, what you do need to understand is that since

10   many of the activities in this case occurred in Maryland and

11   the District of Columbia, for example, those jurisdictions

12   could still prosecute you.  They're not bound by this plea

13   agreement.

14          Do you understand that?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  And have you discussed that with your

17   counsel?  Because you're looking like you maybe were surprised

18   by that.

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  Had you discussed that issue with your

21   counsel?  And if you haven't, it's all right to say you

22   haven't, and then I want to make sure you have enough time to

23   talk to counsel about it.

24          THE DEFENDANT:  I understand, Your Honor.

25          THE COURT:  Had you two talked about that issue?

20

1          MR. BONETA:  Yes.

2          THE COURT:  About the limitation on the scope of

3   immunity?

4          MR. BONETA:  Yes, Your Honor.  And, Your Honor, just

5   for the Court's edification --

6          THE COURT:  Yeah.

7          MR. BONETA:  -- we met Wednesday, and we e-mailed

8   everything, and we've been in constant phone contact to try to

9   get her into the office; she has a tight schedule.

10         But I even talked to her last night.  We met at 8:30

11  this morning and went over everything.  So we did, we did cover

12  that part of the plea agreement, Your Honor.

13         THE COURT:  All right.  Ms. McKelvin, though, this is

14  your day in court, and so when I see a defendant who looks

15  maybe surprised or quizzical, if you want to stop and talk with

16  counsel about this particular issue, feel free to do so.

17         THE DEFENDANT:  I'm okay, Your Honor.

18         THE COURT:  All right, all right.

19         Now, there are some other aspects of this plea

20  agreement I just want to make sure that you're clear about.

21  There's no specific forfeiture items, but is forfeiture

22  envisioned for this defendant?

23         MS. PEDERSEN:  There may be some, but it won't be

24  significant, Your Honor.

25         THE COURT:  All right.  Ms. McKelvin, I do want you

1   to understand that under portions of your plea agreement,

2   specifically paragraphs 14 through 16, you have agreed that if

3   the government identifies property that you used in furtherance

4   of this conspiracy, for example, if there was a car that you

5   drove frequently to meet with people or deliver money,

6   whatever, or if they find an amount of cash that they believe

7   they can trace to this activity, you've agreed to give up your

8   property interest in that property.

9           Do you understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Because it would then be forfeited to the

12  government.

13          You've also agreed in paragraph 17 of the plea

14  agreement that you will within 60 days of the plea being

15  accepted file correct tax returns for the years 2009 through

16  2011 and pay all taxes, interest, and penalties for those years

17  within a reasonable amount of time, working that out with the

18  Probation Office.

19          Do you understand that's part of the plea agreement?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  All right.  Now, in paragraph 9, you've

22  agreed to cooperate with the government, and that cooperation

23  is described in subsections (a) through (g) but includes among

24  other things your agreeing to testify truthfully and completely

25  at any grand juries, trials, or other proceedings; being

1    reasonably available for debriefings and pretrial conferences;

2    and providing the government with any documents, records, or

3    other physical evidence they might need for a criminal case.

4            Do you understand that?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  The government has agreed in paragraph 10

7    that it will not use against you either to increase your

8    sentence or bring a new prosecution any completely truthful

9    information you provide under paragraph 9.  Do you understand

10   that?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Now, defendants who cooperate normally do

13   so with the hope that the cooperation will result in some

14   benefit at sentencing, and that is discussed in paragraph 13 on

15   page 8.  There are two ways in which cooperation can result in

16   a sentencing benefit.

17           The first is if the government files a motion under

18   5K1.1 of the guidelines either before or at the sentencing

19   hearing.  That kind of a motion would ask the Court to sentence

20   below the guideline range because of a defendant's substantial

21   cooperation.

22           The other type of motion is a Rule 35(b) motion.

23   Now, that's filed again only by the government, and that's

24   filed after a person has been sentenced.  So now the person is

25   serving her sentence, and the government asks the Court to

23

1    reduce or lower the sentence because of cooperation.

2            What you need to understand is that the government

3    has not guaranteed or promised you that they will file such a

4    motion even if you cooperate.  Do you understand that?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  And so even if you've talked with the

7    agents or you testify at trial, if they don't feel the

8    testimony was complete or of any value and they don't file one

9    of these motions, that is not a violation of the plea

10    agreement, and it would not give you a basis to withdraw your

11    guilty plea.

12            Do you understand that?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  Moreover, nothing in paragraph 13 is

15    binding on the Court, and that means even if the government did

16    file one of these motions, if the Court did not grant it or did

17    not grant it as far as the government requested, that's not a

18    violation of the plea agreement, and it would not give you a

19    basis to withdraw your guilty plea.

20            Do you understand that?

21            THE DEFENDANT:  Yes, Your Honor.

22            THE COURT:  Now, have you had enough time to discuss

23    everything you know about this case with counsel?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  And has he discussed with you the nature

1    of this conspiracy charge and any ways you could possibly

2    defend yourself against it?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Are you fully satisfied with the way in

5    which your lawyer has worked for you in this case?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  And just for the record, counsel, were

8    there any other plea agreements or plea offers communicated to

9    you by the government that you did not fully communicate to

10   your client?

11             MR. BONETA:  No, Your Honor.

12             THE COURT:  Is this, in fact, the only plea offer you

13   really got from the government?

14             MR. BONETA:  Your Honor, there was one correction we

15   did to this one in regards to on page 3 and 4 that dealt with

16   limitations on asking to stay within the guidelines, and we

17   made that correction this morning with the prosecution.  Other

18   than that, Your Honor, there was no change in the plea

19   agreement.

20             THE COURT:  All right, that's fine.

21             Other than what's in the written plea agreement, has

22   anybody promised or suggested to you that by pleading guilty,

23   you'd get a lighter sentence and more favorable treatment by

24   the Court?

25             THE DEFENDANT:  No, Your Honor.

1    THE COURT:  Has anyone put any force or pressure on

2    you to plead guilty today?

3    THE DEFENDANT:  No, Your Honor.

4    THE COURT:  All right.  Now, do you understand that

5    if you decided to continue with your not guilty plea to Count

6    2, then the government would have the burden of proving your

7    guilt at trial?

8    THE DEFENDANT:  Yes, Your Honor.

9    THE COURT:  In order for them to meet that burden,

10   they'd have to prove each and every one of the elements of the

11   offense beyond a reasonable doubt, so specifically with a 371

12   conspiracy, they have to prove, No. 1, that there was an

13   agreement or a conspiracy between you and the named

14   coconspirators.

15   Do you understand that?

16   THE DEFENDANT:  Yes, Your Honor.

17   THE COURT:  And then they'd have to prove that you

18   knowingly and intentionally had joined into that conspiracy,

19   and so that means that you were not acting with these people by

20   accident or mistake or some other innocent reason.  Do you

21   understand that?

22   THE DEFENDANT:  Yes, Your Honor.

23   THE COURT:  They have to prove that at least one act

24   in furtherance of the conspiracy occurred in the Eastern

25   District of Virginia.  Do you understand that?

```
 1            THE DEFENDANT:  Yes, Your Honor.

 2            THE COURT:  And there are a list of overt acts in

 3  Count 2 of the indictment.  The government must prove beyond a

 4  reasonable doubt and the jury or the judge would have to be

 5  unanimous in deciding on which one, at least one of those overt

 6  acts.  It doesn't have to prove all of them, just one, and you

 7  don't even have to be the person who committed the overt act,

 8  but they have to prove that at least one of those overt acts

 9  did, in fact -- was, in fact -- did occur.

10            Do you understand that?

11            THE DEFENDANT:  Yes, Your Honor.

12            THE COURT:  All right.  Now, if you pled not guilty

13  and went to trial, there are a series of rights and protections

14  a person has at trial which you're basically giving up.  First

15  you could see all the government's witnesses and evidence and

16  test it through the questions of your lawyer.

17            Do you understand that?

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  And you could ask the Court to issue

20  subpoenas that would require the presence at the courthouse of

21  witnesses or physical evidence that you could then use in your

22  defense.  Do you understand that?

23            THE DEFENDANT:  Yes, Your Honor.

24            THE COURT:  You could testify as a witness.  Do you

25  understand that?
```

27

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  You could also invoke your Fifth

3    Amendment right not to incriminate yourself and not testify,

4    and if you remained silent at trial, that silence could not be

5    used as any evidence of guilt.  Do you understand that?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  You would, of course, have the right to

8    the help of a lawyer throughout all stages of your trial, and

9    if you could not afford to pay for an attorney yourself, we

10   would make sure that counsel was appointed for you at

11   taxpayers' expense.  Do you understand that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Now, you opted for a jury trial when you

14   were arraigned.  That means that 12 ordinary citizens would be

15   brought together on a random basis to decide your case.

16          The other option you would have would be a bench

17   trial, in which case just a judge would decide the case, but in

18   either type of trial, whether to a jury or to a judge, you

19   could not be convicted unless the government proved your guilt

20   beyond a reasonable doubt.  Do you understand that?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  And if you continued with a not guilty

23   plea, counsel could try to attack the prosecution's case.

24   There are different ways in which that can be done.  For

25   example, if you gave a confession or a statement when you were

28

1    arrested, there may or may not be a basis to suppress that

2    statement if your *Miranda* rights and other things were not done

3    correctly.

4            I have no idea what motions or what defenses you

5    might have available to you, but what you need to understand is

6    that by pleading guilty, you're giving those up.  Do you

7    understand that?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  And lastly, if you pled not guilty and

10   you went to trial and you were found guilty at trial, you could

11   appeal that finding of guilt to a higher-level court.  Now, do

12   you understand that under the terms of the plea agreement,

13   which we've already gone over, as well as the way the law is

14   structured, by being found guilty based upon your guilty plea,

15   you're giving up your right to appeal your conviction of Count

16   2 of the indictment?

17           Do you understand that?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  All right.  The last thing we need to go

20   over in connection with your plea is the written statement of

21   facts, which is incorporated in the plea agreement.  Now, the

22   statement of facts is -- there are no page numbers on it, but

23   it's 12 numbered paragraphs, and then there's a final signature

24   page, and I see what appears to be your signature on that last

25   page.  Do you remember signing the statement of facts?

29

```
1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  And again, was that signed today?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  But had you had a chance before today to

5    carefully go over the statement of facts?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  All right.  Do you understand that by

8    signing the statement, you are admitting to the truth of

9    everything in those 12 numbered paragraphs, and you're also

10   admitting that if the case had gone to trial, the government

11   would have been able to prove those facts beyond a reasonable

12   doubt?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  All right.  So as I understand it, you do

15   agree that you were a member of the conspiracy from June of

16   2009 through January 25 of 2012; is that correct?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  Now, did you, in fact, know

19   Kuraye Akuiyibo, also known as "G" or Gerald?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  And when did you first meet him?

22             THE DEFENDANT:  I met him in, I believe, 2009.

23             THE COURT:  How did you meet him?

24             THE DEFENDANT:  I was responding to an ad that he had

25   placed on craigslist.
```

30

1          THE COURT:  All right.  What was the ad for?

2          THE DEFENDANT:  To provide companionship.

3          THE COURT:  All right.  Escort services?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Did you actually provide escort services

6     for him?

7          THE DEFENDANT:  Yes.  Yes, Your Honor.

8          THE COURT:  All right.  And did those escort services

9     include prostitution?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  So you were aware then that -- was this

12    for Classy DC Escorts?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  So you were aware then from early on in

15    2009 that he was in that business?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  All right.  Did you also know Otasowie

18    Asuen, also known as Otas or Gene?

19         THE DEFENDANT:  No, Your Honor.

20         THE COURT:  You never knew him?

21         THE DEFENDANT:  No.

22         THE COURT:  How about Ms. Opuiyo?  Did you know her?

23         THE DEFENDANT:  I knew of her.

24         THE COURT:  Did you know her by the names of Amy or

25    Tracy?

31

```
 1              THE DEFENDANT:  Yes, Your Honor.
 2              THE COURT:  All right.  How about Nassim Tabatabai?
 3              THE DEFENDANT:  No, Your Honor.
 4              THE COURT:  Jennifer Churchill?
 5              THE DEFENDANT:  No, Your Honor.
 6              THE COURT:  All right.  But you -- all right.  And
 7    when you were acting as an escort, did you ever cross state
 8    lines?
 9              THE DEFENDANT:  No, Your Honor.
10              THE COURT:  Where were you living at the time you
11    were an escort?
12              THE DEFENDANT:  Virginia.
13              THE COURT:  And where were you performing your
14    services?
15              THE DEFENDANT:  Virginia.
16              THE COURT:  All right.  Did you eventually start to
17    work as a call taker or scheduler?
18              THE DEFENDANT:  Yes, Your Honor.
19              THE COURT:  And when did that -- when did you start
20    doing that?
21              THE DEFENDANT:  When I first provided -- when I first
22    worked as an escort, I did not want to continue, and he --
23              THE COURT:  When you say "he," who do you mean?
24              THE DEFENDANT:  Gerald.
25              THE COURT:  All right.
```

32

1         THE DEFENDANT:  He forced me to basically go for as

2    long as he wanted me to, and then I didn't really have contact

3    with him for a little bit, and at some point in time, Amy, who

4    I know as Amy, wasn't working for him, and he asked me if I

5    would answer the phones for him, and I'm -- I was working, and

6    I had a lot of things going on, so I attempted to do it.  I

7    wasn't very good at it, and so that didn't last very long, and

8    then at some point, we hadn't spoken in probably a year and a

9    half, maybe two years, until December, when Amy went out of

10   town.

11        THE COURT:  So there was a break in your involvement

12   with these people?

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  But you do agree that for some period,

15   you were acting as a scheduler?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  And then back in December, around

18   December 20 -- sometime in December of 2011, you got back

19   involved with this group?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  All right.  And do you agree that as part

22   of what you started doing, you were collecting prostitution

23   proceeds?  Were you collecting --

24        THE DEFENDANT:  I was not collecting any, any

25   proceeds, Your Honor.

33

1            THE COURT:  Did you direct anyone to do it?  In other

2    words, would you call somebody or call one of the escorts and

3    say:  You need to put the money here or take the money there?

4            THE DEFENDANT:  I did not direct them to put the

5    money.  I spoke to the person that picked up the money.

6            THE COURT:  Who was that?

7            THE DEFENDANT:  From -- I knew him as Kobla or

8    George.

9            THE COURT:  And what did you do when you contacted

10   George?

11           THE DEFENDANT:  Well, he contacted me and asked me

12   where the escorts were, and I --

13           THE COURT:  Did you tell him where the escorts were?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  And did you understand why he was asking

16   you about their locations?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  What was your understanding?

19           THE DEFENDANT:  He was going to pick up the proceeds.

20           THE COURT:  All right.  So when paragraph 8 of the

21   statement of facts says on or about December 20, 2011, that you

22   directed the collection of prostitution proceeds on behalf of

23   Classy, is that how you construe what you were doing?  In other

24   words, you were giving this person directions as to where to go

25   to get the money?

34

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  All right.  It says here that on December

3    22 -- I guess there are three days in a row -- the 20th, the

4    21st, and the 22nd -- three days in a row in which you are

5    described as directing the collection of prostitution proceeds.

6              Do you agree that on those three days, you were

7    giving some instruction at least in terms of location as to

8    where this person could go to collect the proceeds?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  I mean, this is your day in court.  I

11   mean, that's what the statement of facts says.  Is that

12   accurate?

13             THE DEFENDANT:  I spoke with him one time during

14   those three days.

15             THE COURT:  Did you understand he was going to make

16   collections on each of those three days?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  Do you agree that also during

19   the December 20 to 22, 2011 time period, you booked dates for

20   several of the Classy escorts?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  And that included Blake, Kandace, Lyssa,

23   Brina, Cassidy, Julia, Nikkie, and Sierra?  I'm looking at

24   paragraph 11.

25             THE DEFENDANT:  During those dates, I don't know who

35

1    was there.  From my recollection, it was one person, but yes,

2    Your Honor, I understand.

3            THE COURT:  Well, did you -- did you book more than

4    one date during that two-day time period -- three-day time

5    period?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  You did?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  And did you then direct the collection of

10   prostitution proceeds from those women and remit the cash to

11   Mr. Akuiyibo?  Did you ever touch the cash?

12           THE DEFENDANT:  No, Your Honor.

13           THE COURT:  All right.  But this person who was

14   collecting it from the women, did -- were you letting him or --

15   him know where he should then take the cash?

16           THE DEFENDANT:  No, Your Honor.

17           THE COURT:  Does the government want to address --

18   the literal wording of that does not appear to be accurate.

19           MS. PEDERSEN:  Your Honor, based on her statements,

20   she's saying that she didn't directly give the cash to him, but

21   the operation was such where they worked in tandem, where the

22   girls were at the hotels, the money person and the scheduler

23   worked so they could communicate to locate where the girls were

24   to coordinate the pickup, and then the money was then remitted

25   back to them.

36

1          Not a lot of people always directly touched the

2    money, but as part of the enterprise, they had a system down

3    for transporting the money from where the girls were in the

4    D.C. area back to the defendant, who was located in --

5          THE COURT:  I totally understand that.  My concern is

6    when you put in a statement of facts that somebody directed

7    someone else to do something, that almost suggests some sort of

8    a leadership or management role, which the Probation Office may

9    pick up on, and I'm not going to -- it doesn't sound as though

10   that's really what's happening here, that this defendant wasn't

11   so much giving orders as just giving --

12          MS. PEDERSEN:  They coordinated.

13          THE COURT:  Then maybe the better way of writing

14   this, I'm putting this on the record should this be an issue at

15   sentencing, the defendant helped to coordinate the collection

16   of prostitution proceeds and the remittance of the cash.  That

17   the government is satisfied is an accurate statement?

18          MS. PEDERSEN:  I think that depicts accurately what

19   she did.

20          THE COURT:  All right.  Ms. McKelvin, are you

21   comfortable with that description of how you conducted yourself

22   in this respect?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  All right.  And then what happened after

25   December 22?

1          THE DEFENDANT:  Amy came back from wherever she was,

2    and I went to go visit my parents for Christmas.

3          THE COURT:  Did you have any more involvement with --

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  All right.  Do you understand that that

6    still is enough to get you involved in this conspiracy?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  And do you understand that if the Court

9    accepts your guilty plea today, there'll be no further trial of

10   the issue, and you will be found guilty today?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  In any respect do you feel you've been

13   forced or pressured into this plea?

14         THE DEFENDANT:  No, Your Honor.

15         THE COURT:  All right.  Then how do you plead to

16   Count 2?  Guilt or not guilty?

17         THE DEFENDANT:  I plead guilty, Your Honor.

18         THE COURT:  All right.  Counsel, have you had enough

19   time to thoroughly go over this guilty plea with your client?

20         MR. BONETA:  Yes, I have, Your Honor.

21         THE COURT:  Are you satisfied that the plea has been

22   made in a knowing and voluntary fashion?

23         MR. BONETA:  Yes, I am.

24         THE COURT:  And does the plea fully accord with your

25   understanding of the facts and circumstances?

38

1          MR. BONETA:  Yes, Your Honor.

2          THE COURT:  And have you received full discovery from

3     the government?

4          MR. BONETA:  Absolutely, Your Honor.  In fact, they

5     had sent me over five disks of materials that we printed out,

6     and I went over everything at their office and both that they

7     gave to us.

8          THE COURT:  All right.  Based upon all these answers

9     to the Court's questions, Ms. McKelvin, I'm satisfied that

10    you've entered your guilty plea in a knowing and voluntary

11    fashion, that you've had the full advice of competent counsel

12    in connection with your plea, and that the written statement of

13    facts as orally amended in court today is more than enough

14    evidence upon which to find you guilty beyond a reasonable

15    doubt, so the plea is accepted, and you're found guilty, and we

16    need to set this case for sentencing.

17          Does July 27 work for you?

18          THE DEFENDANT:  Yes, Your Honor.

19          MR. BONETA:  Yes, Your Honor.

20          THE COURT:  Yes?  All right, that will be at 9:00.

21    There's been no issues raised on bond.  Any problem with the

22    bond?

23          MS. PEDERSEN:  The government has no objection to the

24    continuation on the bond conditions.

25          THE COURT:  All right.  Were there any changes that

39

1    counsel needs for the defendant?

2            MR. BONETA:  No, Your Honor.

3            THE COURT:  All right.  Then, Ms. McKelvin, I'm

4    continuing you on your current bond.  The additional conditions

5    that I'm imposing, however, are that you fully cooperate with

6    the Probation Office as it prepares the pre-sentence report.

7    Do you understand that?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  And that you reappear in this court on

10   Friday, July 27, at 9:00 for sentencing.  Do you understand

11   that?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  All right.  When you leave court this

14   morning, you need to go to Pretrial to check in with them so

15   they know the next reporting date and that you've pled guilty,

16   and then you also need to check in with the Probation Office so

17   that they can start the investigation, and you're free to go at

18   this time.

19           THE DEFENDANT:  Thank you, Your Honor.

20           MS. PEDERSEN:  Thank you, Your Honor.

21           MR. BONETA:  Thank you, Judge.

22                       (Which were all the proceedings

23                        had at this time.)

24

25

40

1                        CERTIFICATE OF THE REPORTER

2         I certify that the foregoing is a correct transcript of

3     the record of proceedings in the above-entitled matter.

4

5

6                                        /s/
                                 Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25